IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LAKISHA ROGERS, o/b/o J.R.,          *
                                     *
     Plaintiff,                      *
                                     *
vs.                                  *     CIVIL ACTION 11-00396-B
                                     *
MICHAEL J. ASTRUE,                   *
Commissioner of Social Security,     *
                                     *
     Defendant.                      *

## ORDER

Plaintiff Lakisha Rogers ("Plaintiff") brings this action on behalf of her minor child, J.R.[1], seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for child supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*. ("SSI"). On June 20, 2012, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 14). Thus, this case was referred to the undersigned to conduct all proceedings through entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 17). Oral

---

[1] Pursuant to the E-Government Act of 2002, as amended on August 2, 2002, the Court has redacted the minor child's name throughout this opinion and refers to him only by his initials, "J.R."

argument was waived. Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.   Procedural History

Plaintiff protectively filed an application for supplemental security income benefits on behalf of her son J.R. on June 10, 2009. (Tr. 104). Plaintiff alleges that J.R. has been disabled since January 1, 2007, due to attention deficit hyperactivity disorder, combined type ("ADHD"), disruptive behavior disorder, NOS, psychotic disorder, NOS, and depressive disorder, NOS. (Id. at 37, 45, 104). Plaintiff's application was denied at the initial stage on September 11, 2009, and she filed a timely Request for Hearing before an Administrative Law Judge ("ALJ"). (Id. at 54-59). On October 1, 2010, the Administrative Law Judge held an administrative hearing, which was attended by Plaintiff, her son J.R., and Plaintiff's attorney, Brooke Thomas. (Id. at 35). On October 8, 2010, the ALJ issued an unfavorable decision finding that J.R. is not disabled. (Id. at 16-31). Plaintiff's request for review was denied by the Appeals Council ("AC") on May 23, 2011. (Id. at 1).

The case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 1383(c)(3).

2

## II.   Issues on Appeal

A.   Whether the ALJ erred in failing to find that J.R.'s psychotic disorder is a severe impairment?

B.   Whether the ALJ erroneously evaluated J.R.'s mental impairments by failing to evaluate J.R. under listing 112.03 (psychotic disorders), in light of J.R.'s diagnosis of psychotic disorder, NOS, and his marked limitation in the domain of interacting and relating to others?

C.   Whether the ALJ erred in finding that J.R. has a "less than marked" limitation in the domain of attending and completing tasks?

## III.  Factual Background

J.R. was born on December 25, 1998, and was eleven years old and in the fifth grade at the LeMoyne School[2] at the time of the ALJ's decision.  (Id. at 16, 39, 104).  At the hearing, J.R.'s mother testified that J.R. had attended George Hall Elementary School before being entering the LeMoyne School for treatment of behavioral issues which included fighting, cursing, and disrespect for authority figures.  (Id. at 39).  According to his mother, J.R.'s grades are "okay," but he "has a hard time focusing" and "can't sit still long enough to really get his work."  (Id. at 41).  However, J.R. takes medication on a daily

---

[2] As discussed in greater detail herein, the LeMoyne School is a day treatment program operated by AltaPointe Health Systems ("AltaPointe") in collaboration with the Mobile County Public Schools System.

basis, and, according to his mother, his behavior is "doing pretty good." (Id. at 42-43).

J.R.'s mother also testified that he plays well "to a certain extent" with his siblings, but he fights with the neighborhood kids. (Id. at 44). He likes to go to school on some occasions, and he does household chores, but she has to instruct him numerous times to get them done. (Id. at 41, 43).

J.R.'s mother also testified that he has had behavior problems while at the LeMoyne School, including fighting on the bus. (Id. at 43). She also stated that he was hospitalized for evaluation in May, 2010, after a violent outburst at school in which he fought staff and other students. (Id. at 45). At the time of the hearing, J.R. was still attending the LeMoyne School and receiving therapy and medication management. (Id. at 45).

IV.  **Analysis**

A.  **Standard Of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[3]  Martin v. Sullivan, 894 F.2d

---

[3] This Court's review of the Commissioner's application of legal principles is plenary. See Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).   The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").   In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision.  Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. 1999).

### B. Childhood Disability Law

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996.  See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c).  The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(i), 20 C.F.R. § 416.906.[4]   The regulations provide a three-step sequential evaluation process for determining childhood disability claims.   20 C.F.R. § 416.924(a).

At step one, a child's age/work activity, if any, are identified to determine if he has engaged in substantial gainful activity.   At step two, the child's physical/mental impairments are examined to see if he has an impairment or combination of impairments that is severe.   Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."   20 C.F.R. § 416.924(c).   To the extent the child is determined to have a severe impairment, at step three, the Commissioner must then determine whether the impairment or combination of impairments meets or is medically

---

[4] On September 11, 2000, the Commissioner published Final Rules for determining disability for a child under the age of 18.   See 65 Fed. Reg. 54,747, corrected by 65 Fed. Reg. 80,307. These rules became effective on January 2, 2001, and apply to Plaintiff's claim.   See 65 Fed. Reg. at 54,751.

or functionally equal to an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P, and otherwise satisfies the duration requirement.  20 CFR § 416.924.

A child's impairment(s) meets the listings' limitations if he actually suffers from limitations specified in the listings for his severe impairment.  Shinn ex rel. Shinn v. Commissioner of Soc. Sec., 391 F.3d 1276, 1279 (11th Cir. 2004).  A child's impairment(s) medically equals the listings if his limitations are at least of equal severity and duration to the listed impairment(s).  Id. (citing 20 CFR § 416.926).  Where a child's impairment or combination of impairments does not meet or medically equal any listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations that functionally equal the listings.[5]  20 CFR § 416.926a.  To establish functional equivalence in step 3, the claimant must have a medically determinable impairment or combination of impairments that results in marked limitations in two functional domains or an extreme limitation in one domain. 20 CFR § 416.926a(a).  The six domains are: (1) acquiring and

---

[5] In making this assessment, the reports of the State Agency medical consultants, reports of other treating, examining, and non-examining medical sources, and the claimant's symptoms, including pain and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, are all taken into consideration. 20 C.F.R. §§ 416.927, 416.929; and SSR 96-5, 96-6p and 96-7p.

using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 CFR 416.926a.

C. **Discussion**

1. **ALJ's Decision**

In this action, the ALJ issued an unfavorable decision on October 8, 2010. (Tr. 16). After setting forth the sequential evaluation process for evaluating child disability claims, the ALJ determined that J.R. has not engaged in substantial gainful activity and that, while he has the severe impairments of attention deficit hyperactivity disorder, combined type, and disruptive behavior disorder, they do not meet, medically equal, or functionally equal the criteria for any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.[6] (Id. at 19).

With respect to the functional equivalence domains, the ALJ found that J.R. has a "marked" limitation in the domain of interacting and relating with others. (Id. at 26-27). However, he found that J.R. has "no limitation" in moving about and manipulating objects and "less than marked" limitations in the

---

[6] The ALJ also considered the cumulative effects of all of J.R.'s impairments, including his non-severe diagnoses of psychotic disorder, NOS, depressive disorder, NOS, and parent-child relational problems. (Tr. at 20, 23, 30).

domains of acquiring and using information, attending and completing tasks, caring for oneself, and health and physical well-being.  (Id. at 24-30).  Accordingly, the ALJ concluded that, because J.R. does not meet or medically equal any of listings set forth in 20 CFR Part 404, Subpart P, Appendix 1, nor does he functionally equal the listings by having an impairment or combination of impairments that results in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, he is not disabled under the Act.  (Id. at 30).

### 2. Record Evidence

#### a. Academic Evidence

In March 2009, when J.R. was ten years old and in the third grade at George Hall Elementary School, he was placed in special education classes because of behavioral issues.[7]  (Id. at 109-15).  At that time, an Individualized Education Program ("IEP") team evaluated J.R. and found him eligible for special education services based on his behavior.  (Id. at 109-115, 124).  J.R.'s testing revealed that he had a non-verbal I.Q. of 95 and was "functioning in the average range on a standardized measure of intelligence (CTONI)."  (Tr. 123).  His achievement scores at

---

[7] J.R.'s application for SSI benefits was filed three months later, in June, 2009.  (Tr. 104).

that time indicated overall reading and math skills within the low average range and overall writing skills within the average range.[8]  (Id. at 123).  Behavioral tests conducted at that same time rated J.R.'s overall behavior as "clinically significant."  (Id. at 124).  Narratives of J.R.'s behavior provided to the examiner by J.R.'s teachers and principals included instances of J.R. having difficulty following directions, inability to concentrate, lack of respect for persons in authority, difficulty getting along with fellow classmates, anger, and defiance. (Id. at 122-23).

    In the fall of 2009, J.R. began the fourth grade at George Hall Elementary School.  (Id. at 151-58). His teacher completed a questionnaire on September 30, 2009.  She noted that J.R. was still having behavioral problems, and those problems correlated with whether he took his medication.  (Id. at 152).  With regard to the area of acquiring and using information, the teacher stated that, when J.R. does not take his medication, his comprehension of material is slow, and he usually becomes angry. (Id.).  However, "[a]s long as he's on his medicine there's no problem in this area."  (Id.).  In the area of interacting and

_____

[8] Additional results from J.R.'s testing performed in February, 2009, reveal a score of 85 on the Woodcock-Johnson Tests of Achievement III (WJIII) (Id. at 119), which is considered "low average."  See http://faculty.virgina.edu/ PullenLab/WJIIIDRBModule/WJIIIDRBModule_print.html.

relating with others, J.R.'s teacher reported that, "due to lack of medication from parent," a behavioral plan had to be developed to remove J.R. from the general classroom to a self-contained class. (Id. at 154). The teacher indicated no problems in the area of moving about and manipulating objects. (Id. at 155). With respect to the area of caring for oneself, the teacher stated that, when J.R. was not on his medication, there was a "vast change" in his appearance, *i.e.*, sometimes he would not comb his hair or brush his teeth. (Id. at 156). The teacher also noted some "obvious" problems in the domains of attending and completing tasks with respect to organizing his things and completing assignments. (Id. at 153-56). However, in this area, as well as all others, she indicated that none of the problems were "serious" or "very serious." (Id.).

In February, 2010, J.R. was transferred from the fourth grade at George Hall Elementary School to the LeMoyne School[9] because of his temper and other behavioral issues that were

---

[9] The LeMoyne School is a "day treatment program operated by AltaPointe Health Systems in collaboration with the Mobile County Public Schools System [which] provides a therapeutic classroom environment and structured day treatment setting for kindergarten through eighth grade students who are unable to maintain their behaviors in a public school setting." See http://careers.altapointe.org/baypointe_LeMoyne.asp. Upon completion of the program, each child transitions back into the public school setting "with improved coping skills and social skills." (Id.). "The Mobile County Public Schools System provides qualified teachers and funds the program." (Id.).

interfering with his ability to learn in a regular classroom setting.  (Id. at 381).  At the LeMoyne School, a special education teacher provided all of J.R.'s academic instruction.[10] (Id. at 166).  Despite behavioral issues, J.R.'s March 2010 IEP indicated that he had achieved all grade level standards in reading, language arts, math, science, and Alabama history for the 2009-2010 school year.  (Id.).  The IEP report stated that J.R. required redirection from his teacher "only when his behavior is out of control" and that "[w]hen he's calm, he's great to work with and will work independently."  (Id.).

At the time of October 1, 2010, hearing before the ALJ, J.R. was eleven years old and in the fifth grade at the LeMoyne School.  (Id. at 39).  J.R.'s mother testified that, while there are still instances of behavioral problems, particularly fighting, his grades are "okay" and, "on this medication, [his behavior is] doing pretty good. . . .  His behavior is not real bad."  (Id. at 41, 43).

---

[10] Because J.R.'s behavioral issues at the LeMoyne School from February, 2010, to September, 2010, are discussed at length herein in relation to the medical evidence in this case, those records will not be detailed here.  The records from the LeMoyne School span from February, 2010, to September, 2010 (Tr. 382), and the ALJ issued his decision the following month, on October 8, 2010.  (Tr. 16).

### b. Medical Evidence

The relevant medical evidence of record shows that J.R. began receiving outpatient therapy from AltaPointe Health Systems in November 2007, when he was eight years old and attending George Hall Elementary School.[11] (Id. at 224). J.R.'s treatment through AltaPointe was in response to repeated instances of acting out in class, aggression, not following rules, and not doing his classwork. (Id.). Dr. Elizabeth Dolgos participated in J.R.'s initial psychiatric evaluation and concluded that J.R. suffered from adjustment disorder with disturbance of mood and conduct and parent child relational problem. (Id. at 226). Dr. Dolgos assigned J.R. a GAF score of 40-50. [12] (Id.). During the evaluation by Dr. Dolgos and her

---

[11] It is unclear from the record whether J.R. was in the first or second grade when he began receiving services from AltaPointe. Although his records from November 2007, indicate that he was in the first grade, this is inconsistent with later records establishing his grade level. (Tr. 224, 205).

[12] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious social dysfunction (e.g., no friends, unable to keep a job). A GAF score of 51-60 suggests moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF score of 61-70 is indicative of mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in (Continued)

staff on November 27, 2007, J.R. reported that, at times in the past, he had heard voices telling him to kill someone, although he indicated that he was not hearing voices at that time.  (Id. at 224).  He also stated that he was having trouble sleeping; he was scared at night; he was having nightmares; and he was sleeping with the lights on.  (Id.).  It was noted that J.R. was calm and cooperative during the interview, with no hyperactivity.  (Id.).

As part of the evaluation, J.R.'s mother was also interviewed, and she reported that J.R. had been acting out since his father had moved back into the home.  (Id.).  She reported that J.R.'s father had been violent before he moved out and had been using drugs.  (Id.).  According to J.R.'s mother, when she and J.R.'s father would fight, J.R. would stand by her to protect her from his father.  (Id.).  It was noted that J.R.'s father had a history of physically abusing his mother in front of J.R., and, at the time of the interview, the mother and father were arguing daily.  (Id.).  After concluding the evaluation, the medical staff at AltaPointe recommended no

social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. See http://www.gafscore. com/. (Last visited September 24, 2012).

medication for J.R. "until the parenting piece is in place."
(Id. at 227). The record reflects that the mother was counseled
regarding good parenting. (Id.).

On March 26, 2009, when J.R. was ten years old and in the
third grade at George Hall Elementary School, he was diagnosed
by Dr. Shakeel Raza at AltaPointe with psychotic disorder, NOS,
depressive disorder, NOS, parent child relational problem, and
disruptive behavior disorder, NOS. (Id. at 276). Two months
later, in May, 2009, J.R. was admitted to Baypointe Hospital, a
facility operated by AltaPointe, where he received in-patient
treatment for one week from Dr. Adeel Rabbani, who diagnosed him
with attention deficit hyperactivity disorder, combined type,
disruptive behavior disorder, NOS, and sibling and parent child
relational problems.[13] (Id. at 200-06).

In his initial evaluation, Dr. Rabbani noted that J.R. was
a ten-year-old male living with his mother and six siblings
ranging from age one to eleven. (Id. at 203-04). J.R. told Dr.
Rabbani that he was in the third grade and that he enjoyed math
and reading books. (Id. at 205-06). J.R. reported that he had
recently been suspended from school for fighting,[14] that he also

---

[13] Dr. Rabbani did not diagnose J.R. with psychotic
disorder.

[14] J.R. told Dr. Rabbani that he had been suspended from
school four times that year for fighting. (Tr. 203).

had fights at home with his older sister, and that he and his sister both had threatened to cut each other with a butter knife. (Id. at 203). J.R. also told Dr. Rabbani that he had heard voices telling him to get a knife and kill his sister and burn the house down. (Id.). According to J.R., the voice was very loud and that of an adult male. (Id.). He also reported having nightmares in which someone was trying to kill him. (Id. at 204). Dr. Rabbani noted that J.R.'s father had moved out of the house around the time that the nightmares began and that J.R. and his family had moved to a new house. (Id.).

During the May, 2009, evaluation, J.R.'s mother reported to Dr. Rabbani that she was having problems with J.R. being defiant and aggressive. (Id. at 201). She stated that "he learned these behaviors from his father," and reported that, at that time, she had a restraining order against J.R.'s father for domestic violence. (Id.). She also reported that J.R. had threatened to kill his father when he got older and "big enough" to do so. (Id.). Dr. Rabbani discussed with J.R.'s mother the cycle of abuse and the need to intervene with the patient at an early age. (Id.). Dr. Rabbani's discharge notes reflect that throughout J.R.'s stay, he participated actively in all group activities and interacted well with other patients. (Id.). Although there were several incidents of redirection due to hyperactivity or disrespect toward staff, Dr. Rabbani noted that

these incidents decreased in frequency during the length of the hospital stay. (Id.). After one week of in-patient treatment, Dr. Rabbani discharged J.R. and recommended that a social worker provide in-home services, that J.R. follow up with a psychiatrist or pediatrician regarding his medication, that J.R. receive individual therapy, that the family receive counseling, and that they seek a psychiatric evaluation should J.R. become suicidal, homicidal, manic, psychotic, or severely depressed. (Id. at 201-02). Dr. Rabbani prescribed Adderall upon discharge.[15] (Id. at 200).

In June and July 2009, J.R. received counseling services from the LeMoyne School via a summer camp program. (Id. at 209). During a meeting with J.R.'s therapist, J.R.'s mother discussed his anger issues and the fact that she was having problems with J.R. shoplifting. (Id.). J.R.'s treatment notes reflect concern by the therapist that the father was back in the home and being a negative influence. (Id. at 217). The therapist noted that the father had shown J.R. his gun, had threatened to kill the mother in front of J.R., had taken J.R.

---

[15] Dr. Rabbani rated J.R.'s GAF score at that time as 55-60 (Tr. 200), which suggests moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). See footnote 12, supra.

with him to go shoplifting, and had an outstanding warrant for his arrest.[16]  (Id.).  J.R.'s records from the LeMoyne School summer camp program reflect continuing problems with J.R.'s anger, defiance, use of profanity, lying, fighting, and stealing.  (Id. at 211, 223, 235, 240).  The records also indicate, however, that when redirected, J.R. was able to cease inappropriate behavior, follow instructions, and make positive choices.  (Id. at 211, 213-14, 223, 235, 238).  Specifically, J.R.'s therapists reported that that he was doing well on his medication,[17] that he was not having any hallucinations, that he had shown improvement with his anger, that he expressed an understanding of consequences, that he accepted responsibility when he made poor choices, that he was cheerful, calm, respectful, and cooperative, and that he had made a friend. (Id.).

In the fall of 2009, J.R. began the fourth grade at George Hall Elementary School.  In September, 2009, a State Agency consultant, William H. Simpson, Ph.D. (hereinafter "Dr.

---

[16] The therapist also noted that J.R.'s mother was expecting another child with J.R.'s father and that she appeared to be suffering from depression.  (Tr. 217).  The therapist expressed concern that, when the father was in the home, the mother was not allowed to have contact with her family or friends.  (Id.).

[17] In July, 2009, J.R. was taking Seroquel, Adderall, and Prozac.  (Tr. 213).

Simpson"), performed a Childhood Disability Evaluation and
determined that J.R.'s impairment or combination of impairments
(ADHD, disruptive behavior disorder, and sibling relational
problems) were severe but did not meet, medically equal, or
functionally equal the listings. (Id. at 241-44). Dr. Simpson
opined that J.R. has a "marked" limitation in interacting and
relating with others (noting that J.R. was taking Prozac and
Seroquel), a "less than marked" limitation in attending and
completing tasks (noting that J.R. was taking Adderall for
impaired concentration), and "no limitation" in acquiring and
using information (based on his IEP and test scores), moving
about and manipulating objects, caring for oneself, and health
and physical well-being. (Id.).

From August 2009, through January 2010, J.R.'s medical
records show that he continued to experience frequent anger and
defiance problems at school and that he had threatened to beat
up the teacher. (Id. at 256, 258, 263, 265). The records
reflect no hallucinations during this time. (Id. at 251, 270,
273). J.R.'s therapists documented that he was upset that his
father had moved back into the home. One therapist noted in
January 2010, that J.R.'s parents "have [a] long history of
arguing to [the] point of father saying he was going to kill
[the] mother." (Id. at 250). The therapist expressed "concern
about the welfare of the children and what the future plans

19

are."   (Id. at 259).   The therapist also noted that J.R. "was off his medications for 1 and 1/2 month[s] due to mother letting Medicaid lapse."  (Id. at 262, 264-65).

A second therapist noted in December 2009, that J.R. "does not like Dad returning.  He is still angry at Dad for the past." (Id. at 252).   J.R.'s therapists noted that he was performing poorly in school, was not sleeping, and was worried about his mother.  (Id. at 252, 273).   In August 2009, J.R. ran away from daycare to go home because he was afraid that his Mom would be killed.  (Id. at 274).   Notwithstanding these problems, J.R.'s therapists reported some progress.   In January 2010, they noted that J.R. had given helpful advice to a peer to not allow himself to be used by others and that he was pleasant and engaged during his session. (Id. at 250-51).   J.R.'s treatment plan at that time included family therapy and a medication regimen of Seroquel and Prozac.   (Id. at 253).

As discussed above, in February 2010, J.R. was transferred from the fourth grade at George Hall Elementary School to the LeMoyne School for additional behavioral therapy and was still attending the LeMoyne School at the time of the administrative hearing on October 1, 2010.  (Id. at 39, 381).   J.R.'s records at the LeMoyne School from February 2010 until September 2010 show that he continued to have behavioral problems including

incidents of fighting,[18] being disrespectful, bullying peers into bringing money to him, stealing, lying, blaming others, using profanity, threatening to kill peers if they got him into trouble or if they refused to bring him money, being manipulative, and refusing to do his work.  (Id. at 191, 281, 286, 312, 314, 323, 325, 360, 368, 375, 377).  On April 22, 2010, his therapist reported on a staff meeting which included J.R.'s special education teacher.  During the meeting, the staff described J.R. as "academically smart" but stated that he becomes very frustrated when he does not receive help immediately.  (Id. at 336).  The therapist further reported that J.R. "will pick on the weak kids," threaten them, and deny it.  (Id.).  The therapist described J.R. as manipulative, stating that he "will split [the] staff to get what he wants."  (Id.).

Despite these problems, J.R.'s records at the LeMoyne School also document repeated instances of positive behavior upon redirection,[19] including following directions, being respectful, being polite, being cooperative, having a positive

---

[18] In September, 2010, when J.R. was eleven years old and in the fifth grade at the LeMoyne School, the bus driver requested that his mother ride the bus with him one or two days a week until his behavior improved because he had threatened to beat up a peer and had used profanity.  (Tr. 191).

[19] On July 14, 2010, J.R.'s therapist, Jennifer Paloma, stated: "most of the time [J.R.] will respond positively when staff redirects him on a one-to-one basis."  (Tr. 281).

attitude, taking responsibility for his actions, showing empathy, demonstrating good insight, being smart, quick, and focused, controlling his behavior, participating well with others, completing his work, exhibiting good sportsmanship, exhibiting good social skills, and using good manners.[20]   (Id. at 281, 284, 288, 292, 294, 298, 303, 333, 342, 346, 370, 407, 419, 422).

In February 2010, Dr. Raza noted that while J.R. has a history of nightmares and hearing voices, according to his mother, he "has not had these nightmares or heard voices for the past two years."   (Id. at 276).   On April 5, 2010, J.R.'s therapist noted that, while he continued to have defiance issues in the classroom and at home, his aggressive behavior had decreased, and he was doing more work in the classroom.   (Id. at 346).   J.R.'s therapists and special education teacher also noted a correlation between J.R.'s behavior and the consistency with which he takes his medication.   (Id. at 322, 324, 388-90, 399-400).   They noted that J.R. "does well in his classwork once he takes his medication."   (Id. at 400).

In August 2010, one of J.R.'s therapists, Jennifer Paloma, wrote a letter at the request of J.R.'s mother summarizing

---

[20]   These record references span February, 2010, through August, 2010.

J.R.'s treatment at the LeMoyne School.  (Id. at 381).  In the letter, Ms. Paloma described J.R.'s behavioral problems as including difficulty controlling his temper, frequent anger outbursts in class, refusing to follow directions, provoking others, threatening to kill his peers, physical aggression, cursing, arguing, and fighting.  (Id.).  Ms. Paloma stated that in light of these behavioral issues, J.R. was in special education classes and was receiving bi-weekly individual therapy, weekly group therapy, family therapy as needed, and seeing a child psychiatrist at least once every three months. (Id.).  She listed his diagnoses as disruptive disorder NOS, psychotic disorder NOS, depressive disorder NOS, and parent child relational problem and noted that he was taking Seroquel, Ritalin, Adderall, Prozac, and Risperdal.  (Id.).  Ms. Paloma stated, "on his good days [J.R.] will be polite, offer to help, cooperate and is willing to do his school work.  On many occasions [J.R. has verbally expressed . . . his love for his mother and younger siblings."  (Id.).  Ms. Paloma stated that the length of the stay at the LeMoyne School depends on the progress made by the child and that an average stay was twelve to eighteen months.  (Id.).  At the time of Ms. Paloma's letter, J.R. had been attending the LeMoyne School for six months. (Id.).

At the hearing on October 1, 2010, J.R.'s mother testified that J.R. was still having behavioral problems, particularly in the area of fighting.  (Id. at 43).  However, she stated that, with his medication, his behavior is "pretty good . . . . His behavior is not real bad."  (Id. at 42-43).

### 3.   Analysis

Plaintiff argues that the ALJ committed reversible error by: (1) failing to find that J.R.'s psychotic disorder is a severe impairment; (2) failing to evaluate J.R. under Listing 112.03 in light of Plaintiff's diagnosis of psychotic disorder and the ALJ's finding that the Plaintiff has a marked limitation in the domain of interacting and relating with others; and (3) finding that J.R. has a "less than marked" limitation in the domain of attending and completing tasks.  (Doc. 11 at 1-2). For the reasons set forth herein, the Court finds that Plaintiff's arguments are without merit.

### a.  Whether the ALJ committed reversible error by failing to find that J.R.'s psychotic disorder is a severe impairment?

Plaintiff argues that the ALJ erred at step two of his analysis by failing to find that J.R.'s psychotic disorder is a severe impairment.  Plaintiff argues that, under Social Security Ruling 96-3p, the evaluation of whether an impairment of an individual under the age of eighteen is "severe" requires an assessment of the "functionally limiting effects" of an

impairment on the individual's ability "to do age-appropriate
activities."   (Doc. 11 at 2).   As Plaintiff points out, "an
impairment(s) is considered 'not severe' if it is a slight
abnormality(ies) that causes no more than minimal limitation in
the individual's ability to function independently,
appropriately, and effectively in an age-appropriate manner."
SSR 96-3p, 1996 SSR Lexis 10.

In this case, the ALJ deemed two of J.R.'s mental
impairments to be severe (ADHD and disruptive behavior disorder)
and then proceeded with the sequential inquiry to step three
where he considered the combined effect of all of J.R.'s
medically determinable impairments, even those that were not
considered to be severe.   (Tr. 19-30) (applying 20 C.F.R. §§
416.924, 416.925, and 416.926.   Although the ALJ did not discuss
the severity of J.R.'s psychotic disorder (nor of his depressive
disorder or parent child relational problem) at step two of the
analysis, his failure to do so does not constitute error.

Assuming, *arguendo*, that J.R.'s psychotic disorder were
severe, the ALJ's failure to make that finding at step two is
not error because the ALJ had already found that the ADHD and
disruptive behavior disorders were severe.   The Eleventh Circuit
has recognized that any severe impairment, regardless of whether
the impairment resulted from a single impairment or combination
of impairments, which qualifies as severe, satisfies step two.

See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir.1987) ("[S]tep [two] acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two."). Thus, because a severe impairment at step two of the evaluation existed, the ALJ's failure to consider any other impairment at that stage was not error. See Johnson v. Astrue, 2009 U.S. Dist. LEXIS 111826, *10 (M.D. Fla. November 13, 2009,) (finding "no error" in ALJ's failure to find "additional severe impairments" at step two of the analysis where ALJ had already found that Plaintiff suffered from other severe impairments.). Therefore, Plaintiff's argument that the ALJ erred at step two of his analysis by failing to find that J.R.'s psychotic disorder is a severe impairment is without merit.

   b. **Whether the ALJ committed reversible error by failing to evaluate J.R. under Listing 112.03 in light of J.R.'s diagnosis of psychotic disorder and his marked limitation in the domain of interacting and relating with others?**

Next, Plaintiff asserts that the ALJ erred in failing to evaluate J.R.'s impairments under Listing 112.03, given that J.R. has been diagnosed with psychotic disorder and has a

"marked" limitation in the domain of interacting and relating
with others. (Doc. 11 at 4). Defendant responds that the ALJ's
consideration of Listing 112.03 is implied inasmuch as the ALJ
considered all of J.R.'s mental impairments (including psychotic
disorder) and found that those impairments, in combination, did
not meet *any* listing, which impliedly includes Listing 112.03.
(Doc. 12 at 9).

 The Eleventh Circuit has explained the purpose and
application of the Listing of Impairments, as follows:

> The Listings include medical criteria
> for specified disorders of thirteen major
> body systems. These impairments are so
> severe that an individual who has a listed
> impairment is generally considered unable to
> work based upon medical considerations
> alone. 20 C.F.R. § 416.925(a). A claimant
> may prove that he is disabled by either (1)
> *meeting* the Listings or (2) *equaling* the
> Listings. In order to *meet* a Listing, the
> claimant must (1) have a diagnosed condition
> that is included in the Listing and (2)
> provide objective medical reports
> documenting that this condition meets the
> specific criteria of the applicable Listing
> and the duration requirement. A diagnosis
> alone is insufficient. 20 C.F.R. §
> 416.925(c)-(d). In order to *equal* a
> Listing, the medical findings must be at
> least equal in severity and duration to the
> listed findings.

Wilkinson on behalf of Wilkinson v. Bowen, 847 F.2d 660, 662
(11th Cir. 1987) (emphasis in original). See also Bell v.
Bowen, 796 F.2d 1350, 1353 (11th Cir. 1986) (finding that "when

a claimant contends that he has an impairment meeting the listed impairments . . . he must present specific medical findings that meet the various tests listed under the description of the applicable impairment. . . ."); Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (providing that a "[d]iagnosis of a listed impairment is not alone sufficient; the record must contain corroborative medical evidence supported by clinical and laboratory findings."). Moreover, the United States Supreme Court has found:

> Each impairment [in the Listings] is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.   An impairment that manifests only some of those criteria, no matter how severely, does not qualify.

Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in original).

In order to prove equivalency to a listed impairment, a plaintiff must provide objective medical findings that support each of the criteria for the impairment under which he claims equivalency.  Bell, 796 F.2d at 1353 (providing that "if in the alternative [claimant] contends that he has an impairment which is equal to one of the listed impairments, the claimant must present medical evidence which describes how the impairment has such an equivalency."").   A claimant must show that the

28

impairments produce functional limitations or restrictions equivalent to those required under the particular listing. Objective tests must be present to support a finding of equivalence. See 20 C.F.R. § 416.926(a); see also Sullivan, 493 U.S. at 531; Foster v. Astrue, 2009 U.S. Dist. LEXIS 41208, *25 (S.D. Ala. May 15, 2009). Also, the medical findings must be at least equal in severity and duration to the listed findings. Wilkinson, 847 F.2d at 662. Plaintiff has the burden of producing medical evidence that establishes all of the required medical findings. See, e.g., Bowen v. Yuckert, 482 U.S. 137, 146 & n.5 (1987). See also 20 C.F.R. § 416.926 (determining medical equivalence for adults and children); 20 C.F.R. § 416.926a (determining functional equivalence for children).

Contrary to Plaintiff's assertion that the ALJ erred in failing to specifically state which listing he considered, the ALJ's finding that J.R.'s impairment did not meet a particular listing can be implied. Keane v. Commissioner of Social Security, 205 Fed. Appx. 748, 750 (11th Cir. 2006); Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986) ("While the ALJ did not explicitly state that the appellant's impairments were not contained in the listings, such a determination was implicit in the ALJ's decision . . . While Appendix 1 must be considered in making a disability determination, it is not required that the Secretary mechanically recite the evidence leading to [his]

determination.   There may be an implied finding that a claimant does not meet a listing."); Barron v. Sullivan, 924 F.2d 227, 230 n.3 (11th Cir. 1991)   (noting that "it would be helpful to appellate courts if the ALJ would specifically tie his findings to particular listings that the claimant has argued," but it is not error to fail to do so where "the evidence supports the conclusions of the ALJ, despite the lack of any particular discussion of [Plaintiff's] impairment as it relates to [the claimed] Listing."); Foster, 2009 U.S. Dist. LEXIS 41208, *26-28 (S.D. Ala. May 15, 2009) (ALJ's failure to specifically state which listing he considered was not error, and his finding that claimant did not meet, medically equal, or functionally equal a particular listing was implied, where the substantial evidence did not establish the criteria under the listing).   Cf., Ellington v. Astrue, 2008 U.S. Dist. LEXIS 32254, *23 (M.D. Ala. April 18, 2008) (Where the ALJ's decision is not supported by substantial evidence or it cannot be determined whether the ALJ's decision is supported by substantial evidence, the ALJ's failure to consider applicable listings warranted a reversal).

In his decision, the ALJ found that J.R. had the severe impairments of ADHD, combined type, and disruptive behavior disorder, and he found that J.R.'s impairment, or combination of impairments, both severe and non-severe, did not meet, medically equal or functionally equal *any* of the listed impairments in 20

30

CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).  (Tr. 19-20).  While the Plaintiff is correct that the ALJ did not explicitly reference Listing 112.03, the undersigned finds, based upon a thorough review of the record, that the ALJ implicitly found that J.R.'s impairment, or combination of impairments, does not meet or medically equal Listing 112.03, and the substantial evidence in the record supports that finding.

Section 112.03 of the Listings, "Schizophrenic, Delusional (Paranoid), Schizoaffective, and Other Psychotic Disorders," requires a showing of <u>both</u> the A-criteria <u>and</u> the B-criteria of that Listing.  The A-criteria of Listing 112.03 requires:

> Medically documented persistence, for at least 6 months, either continuous or intermittent, of one or more of the following:
>
>> 1. Delusions or hallucinations; or
>>
>> 2. Catatonic, bizarre, or other grossly disorganized behavior; or
>>
>> 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech; or
>>
>> 4. Flat, blunt, or inappropriate affect; or
>>
>> 5. Emotional withdrawal, apathy, or isolation.

20 CFR Pt. 404, Subpt. P, App. 1, § 112.03(A).  The B-criteria of Listing 112.03 requires that the claimant's mental

31

impairment(s) results in "marked" impairment in <u>two or more</u> of the following areas:

> a.  Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or
>
> b.  Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
>
> c.  Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>
> d.  Marked difficulties in maintaining concentration, persistence, or pace.

20 CFR Pt. 404, Subpt. P, App. 1, § 112.03(B) (citing 112.02(B)(2).  A review of the evidence shows that J.R.'s impairments did not meet or equal this Listing.

The only evidence in the record relating to the A-Criteria of Listing 112.03 consists of reports by J.R. in November, 2007, and May, 2009, that he heard voices telling him to kill somebody. (Tr. 203-04, 224). In May, 2009, J.R. reported that the voice told him to burn the house down and to kill his sister. (Id. at 203-04). As of July, 2009, the record indicates that J.R. no longer heard voices or had hallucinations. (Id. at 238, 250-51, 273). The Court finds that the A-Criteria is met by this evidence.[21]

Turning to the B-Criteria, the Court finds that J.R. meets the criteria of subparagraph (b), "marked impairment in age-appropriate social functioning," based on the well-documented issues with J.R.'s behavior that have been set forth in detail in this opinion. However, the Court finds that the remaining criteria in subparagraphs (a), (c), and (d) are not met.

First, with respect to subparagraph (a) of the B-criteria, cognitive and communicative functioning, the evidence shows that, despite J.R.'s behavioral issues, he has a non-verbal I.Q. of 95 and functions "in the average range on a standardized measure of intelligence" (Tr. 123); his achievement scores in

---

[21] The Court rejects Plaintiff's implication (Doc. 11 at 5-6) that isolated record references to J.R. staring off into space and refusing to eat, walk, or speak are evidence of catatonic behavior, as there is no medical evidence in the record to support such a finding.

March, 2009, indicate overall reading and math skills within the low average range and overall writing skills within the average range (Id.); in September, 2009, J.R.'s teacher reported that his problems with acquiring and using information and concentration are resolved as long as he is taking his medication (Id. at 152-56); the March, 2010, IEP indicated that J.R. had achieved all grade level standards in reading, language arts, math, science, and Alabama history for the 2009-2010 school year (Id. at 166); J.R.'s mother testified at the hearing on October 1, 2010, that, while there were still instances of behavioral problems, J.R's grades were "okay" and, on his medication, his behavior was "doing pretty good." (Id. at 41, 43); and J.R.'s mother indicated in her application that J.R. could speak and be understood, most of the time, even by people who do not know him well and that his ability to communicate was not limited.[22]   (Id. at 132-33).  This evidence indicates that any limitation that J.R. may have in the area of cognitive and communicative functioning does not rise to the "marked" level.

Next, with respect to subparagraph (c) of the B-criteria, marked impairment in age-appropriate personal functioning,

---

[22] J.R.'s mother contradicted this statement at the hearing on October 1, 2010, when she testified that she "really can't understand what [J.R.] is trying to say." (Tr. 44). Notably, none of J.R.'s teachers or therapists indicated any problems understanding J.R. when he spoke.

Case 1:11-cv-00396-B   Document 18   Filed 09/25/12   Page 35 of 40
J.R.'s mother stated in her application that his impairments do not affect his ability to help himself or to cooperate with others in taking care of his personal needs. (Id. at 137). She further testified at the hearing that J.R. performs chores such as cleaning his room and sweeping. (Id. at 43-44). This evidence indicates that J.R. has no limitation in the area of personal functioning, and Plaintiff has not presented any evidence to the contrary.

Finally, with respect to subparagraph (d) of the B-criteria, marked difficulties in maintaining concentration, persistence, or pace, the record evidence indicates the following: J.R. does well on his medication;[23] as previously stated, J.R. achieved all grade level standards in reading, language arts, math, science, and Alabama history for the 2009-2010 school year[24] (Id. at 166); according to Dr. Simpson, the State Agency consultant who evaluated J.R.'s limitations, J.R. does not have a "marked" limitation in the area of attending and completing tasks (noting that J.R. takes Adderall for impaired concentration) (Id. at 243-44); while attending the LeMoyne

---

[23] As discussed above, J.R. takes Adderall for impaired concentration. (Tr. 200, 213).

[24] The March, 2010, IEP indicated that "when [J.R. is] calm, he's great to work with and will work independently." (Tr. 166). He requires support from his teacher "only when his behavior is out of control." (Id.).

School from February 2010 to the date of the hearing, J.R. exhibited positive behaviors upon redirection, including following directions, being cooperative, having a positive attitude, being smart, quick, and focused, controlling his behavior, participating well with others, and completing his work (Id. at 281, 284, 288, 292, 294, 298, 303, 333, 342, 346, 370, 407, 419, 422); in April, 2010, J.R.'s aggressive behavior had decreased, and he was doing more work (Id. at 346); according to J.R.'s special education teacher and therapist, he "does well in his classwork once he takes his medication." (Id. at 400). This evidence indicates that J.R. does not have marked difficulties in maintaining concentration, persistence, or pace.

Based on the foregoing, Plaintiff failed to establish the criteria of Listing 112.03, and, therefore, the ALJ's failure to find that J.R. met Listing 112.03 was not erroneous. See Keane, 205 Fed. Appx. at 750-51 (11th Cir. 2006) (court affirmed ALJ's implied finding that Plaintiff's impairments did not meet or equal the listing at issue where the substantial evidence did not establish the criteria under the listing.). Moreover, even assuming error in the ALJ's failure to specifically discuss Listing 112.03, any error was harmless given the absence of substantial evidence that J.R.'s impairments met or equaled the Listing.

36

In his decision, the ALJ also found that J.R.'s impairments did not functionally equal *any* Listing, which impliedly included Listing 112.03. In reaching that decision, the ALJ stated that he considered all of the relevant evidence in the case record, as required by 20 CFR 416.924a(a) and SSR 09-2p; he evaluated the "whole child," as provided in 20 CFR 416.926a(b) and (c) and SSR 09-1p; he assessed the interactive and cumulative effects of all of J.R.'s medically determinable impairments whether severe or non-severe; and he considered the degree of limitation in each of the six functional equivalence domains. (Tr. 20).

With respect to the six functional equivalence domains, the ALJ found that J.R. had a "marked" limitation in only one domain, interacting and relating with others. (Id. at 26). He found "no limitation" in the domain of "moving about and manipulating objects" and "less than marked" limitations in the remaining four domains. (Id. at 24-30). He concluded that J.R. "does not have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning." (Id. at 30). Therefore, J.R. is not disabled. (Id.).

Plaintiff challenges only one of the ALJ's findings related to the six functional equivalence domains, arguing that the ALJ erred in his determination that J.R. has a "less than marked"

limitation in the domain of attending and completing tasks.
(Doc. 11 at 6).  The Court turns now to that issue.

> c.  **Whether the ALJ erred in finding that J.R. had a "less than marked" limitation in the domain of attending and completing tasks?**

Plaintiff argues that the ALJ should have found that J.R. has an extreme limitation in the domain of attending and completing tasks.  (Doc. 11 at 6).  Plaintiff argues that J.R. exhibited "extreme behaviors both in public school and in an extensive day treatment program." (Id.).  Plaintiff specifically refers to a letter that was written by the bus driver at the LeMoyne School on September 20, 2010, in which the bus driver requested that J.R.'s mother ride the bus with J.R. for a few days until his behavior improved, after he was involved in a fight with a peer on the bus.  (Tr. 191).  Plaintiff states that J.R. has been described as "physically violent and threatening to his peers" and "required in-patient mental health treatment because he threated to kill his classmates." (Doc. 11 at 6). According to Plaintiff, these incidents, "along with the additional behavior and social issues discussed in Issues 1 and 2[,] support a finding of an extreme limitation in the domain of attending and completing tasks." (Id.).  The Court disagrees.

The ALJ's finding that J.R. did not have a "marked" or "extreme" degree of limitation in the domain of attending and completing tasks is well supported by the record.  As the ALJ

38

found, the August 2010 treatment records from J.R.'s therapist
and his special education teacher show that J.R. "does well in
his classwork [when] he takes his medication."   (Tr. 25, 400).
LeMoyne School records show that from late July to mid-September
2010, J.R.'s perceptions were generally within normal limits;
his thoughts were logical and coherent and within normal limits;
and he had fair or good insight, fair judgment, and no anxiety.
(Id. at 25, 385, 392, 406, 408, 410, 413-414, 420, 423, 430).
J.R.'s teacher reported no more than slight to obvious problems
within this domain (the only two "obvious" problems were with
organizing and completing class and homework assignments), and
she indicated that none of the problems were "serious" or "very
serious."   (Id. at 25-26, 153-56).   J.R.'s teacher also
described him as having only "slight" problems on a monthly
basis with paying attention when spoken to directly, and no
problems carrying out single-step instructions and working
without distracting himself or others.   (Id. at 26, 153).
Additionally, J.R.'s special education teacher noted that J.R.
completed standardized testing according to directions and
worked the entire time that she was in the room.   (Id. at 26,
112).   In light of this evidence, it was reasonable for the ALJ
to find that J.R. had "less than marked" limitations in the
domain of attending and completing tasks.   (Id. at 25-26).

Accordingly, based on the totality of the evidence before the ALJ, the undersigned finds that the ALJ did not err in concluding that J.R. does not meet or equal a listing, specifically Listing 112.03, and does not have marked limitations in at least two domains or an extreme limitation in one domain such that he functionally meets a listing.[25]   The ALJ's opinion in this case is consistent with standardized testing results, school records, medical opinions, and other observations by J.R.'s teachers and mother.   Accordingly, viewing the record in its entirety, the undersigned is satisfied that the ALJ's decision finding that J.R. is not disabled is supported by substantial evidence.

V.   **Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income, be **AFFIRMED.**

DONE this **25th**[th] day of **September, 2012.**

                              /s/ SONJA F. BIVINS
                         **UNITED STATES MAGISTRATE JUDGE**

---

[25]   Although Plaintiff only challenged the ALJ's findings with respect to one functional equivalence domain, the Court finds, after thoroughly reviewing the record, that the ALJ's determinations with respect to all six functional equivalence domains are supported by substantial evidence in the record.